**AFFIDAVIT**

I, JASON GREENFIELD, a Special Agent with the Drug Enforcement Administration (DEA), being duly sworn, do hereby depose and state that the following is true to the best of my information, knowledge, and belief:

**BACKGROUND OF AFFIANT**

1. I am a Special Agent with the Drug Enforcement Administration (DEA), United States Department of Justice, and as such I am empowered under Title 21, United States Code, § 878, to enforce Title 21 and other criminal laws of the United States, to make arrests and obtain and execute search, seizure and arrest warrants. I have been employed as a DEA Special Agent for approximately twelve years. In connection with my official duties, I investigate criminal and civil violations of the Controlled Substances Act, and I have testified in judicial proceedings for violations of laws concerning controlled substances. During my time with DEA, I have participated in numerous drug trafficking investigations, including investigations that have resulted in felony arrests for violations of Title 21 of the United States Code. I have been involved in various types of electronic surveillance, in the execution of search and arrest warrants, and in the debriefing of defendants, witnesses and informants, as well as others who have knowledge of the distribution and transportation of controlled substances, and of the laundering and concealing of proceeds from controlled substance trafficking.

2. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended merely to show that there is sufficient probable cause for the requested search warrant and does not set forth all of my knowledge about this matter.

## PURPOSE OF THIS AFFIDAVIT

3. This affidavit is submitted in support of a search warrant for a cell phone and a Tom-Tom GPS Unit, which were in the possession of James WARE and was seized incident to his arrest on February 4, 2019 in Mesa County, State of Colorado.

## IDENTIFICATION OF THE DEVICE(S) TO BE EXAMINED

4. The items held in evidence at the Grand Junction Resident Office in Grand Junction, Colorado, which were in the possession of James WARE, and were seized subsequent to his arrest on February 4, 2019 by the Colorado State Patrol. The items include:

   a. One black I-phone with unknown phone number, obtained from WARE, currently in DEA evidence marked as Exhibit N-2.

   b. One Tom-Tom GPS Unit obtained from WARE, currently in DEA evidence marked as Exhibit N-3.

5. The above items will hereinafter be referred to as "Device(s)" as well as in Attachments A and B.

6. I believe there is probable cause to believe that the Device(s) are or contain evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841 and 846, The applied-for warrant would authorize the forensic examination of the Device(s) for the purpose of identifying electronically stored data particularly described in Attachment B.

7. The Device(s) are currently in the lawful possession of the DEA Grand Junction Resident Office (GJRO). They came into the DEA's possession in the following way:

   a. On February 4, 2019, Colorado State Patrol arrested James Ware for possession of approximately 47 pounds of cocaine and 19 pounds of methamphetamine. Trooper Vrbas found the phone, the GPS unit within the vehicle WARE was

driving, and WARE was the only occupant of the vehicle. During the course of the stop, SA Zac Jones and SA Jason Greenfield responded to the area, seized the phone and GPS Unit, and processed into evidence as Exhibits N-2 and N-3 at the GJRO.

8. The Device(s) are currently in storage at the DEA GJRO located at 2734 Crossroads Blvd., Grand Junction, CO 81506. In my training and experience, I know that the Device(s) all have been stored in a manner in which the contents are, to the extent material to this investigation, in substantially the same state, as they were when the Device(s) first came into the possession of the CSP and subsequently seized by DEA.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

9. Based on my training and experience, I know about the following items, hereinafter and below and in the Attachments "Device(s)."

10. A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable digital storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media includes various types of flash memory cards and miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos such as texts, word processing documents, or web pages. If the camera is equipped with global positioning system ("GPS") technology, that information may be recorded as metadata associated with the photographs and videos taken with that camera as well as other information such as the make and model of the camera and the date and time the image was created. Some cameras and removable

storage media are now equipped with wireless capabilities, which allow for images and files to be uploaded from the camera or digital storage media directly to the Internet or to other digital storage devices or computers using a wired or wireless connection.

    11. A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet including websites, social media sites, bulletin boards, file sharing, and other Internet sites.   Wireless telephones often have a subscriber identity module or subscriber identification module ("SIM"), which is an integrated circuit that securely stores the International Mobile Subscriber Identity ("IMSI") and the related key used to identify and authenticate subscribers on mobile telephone devices. A SIM is embedded into a removable "SIM card," which can be transferred between different mobile devices. A SIM card contains a unique serial number ("ICCID"), IMSI, security authentication and ciphering information, temporary information related to the local network, a list of the services to which the user has access, and certain passwords. Most SIM cards will also store certain usage data, such as call history, text ("SMS") messages, and phone book contacts. Wireless telephones may also be

"smartphones," such that they operate as personal computers capable of accessing the Internet. They may also include GPS technology for determining the location of the device. Such telephones may also contain removable storage media, such as a flash card—such devices can store any digital data, and can have the capacity to store many gigabytes of data. Some cellular telephones also have software, giving them the same capabilities as personal computers including accessing and editing word processing documents, spreadsheets, and presentations. Some cellular telephones also operate as a "tablet," or mobile computer, and can contain software programs called applications. Those programs can perform different functions and save data associated with those functions, including use associated with the Internet.

12. A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

13. A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and

send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include GPS technology for determining the location of the device.

14. A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, which is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "Wi-Fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

15. A hard disk drive ("HDD"), also known as a hard drive or hard disk, is a data storage device that consists of an external circuit board, external data, power connections, and internal glass, ceramic, or magnetically charged rotating metal platters that permanently store data even when powered off. A solid-state drive ("SSD"), also known as a solid-state disk, is a data storage device that uses integrated circuit assemblies as memory to store data permanently, instead of using rotating platters. Flash drives, flash cards, and thumb drives are digital storage devices that can connect to computers or other devices using the appropriate connection. CDs/DVDs are digital storage devices capable of storing large amounts of digital data—a user can store information onto a CD/DVD by "burning" digital data to the device using a computer

CD/DVD drive. These devices are capable of storing any electronic information including images, videos, word processing documents, programs and software, and web pages.

16. A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

17. Computer routers and modems are also used as instrumentalities of crimes involving computers both to operate the computer to commit criminal offenses involving the sexual exploitation of minors. Modems and routers can contain information about dates, IP addresses, MAC addresses, frequency, and computer(s) used to access the Internet, and some have separate digital storage capacity that allow them to connect to other devices and to store information similar to an external digital storage device like a flash card or thumb drive. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device or the computers and devices connected to it.

18. "Computers" or "digital storage media" or "digital storage devices" may be used interchangeably, and can include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, game consoles, network

hardware, hard disk drives, RAM, floppy disks, flash memory, CDs, DVDs, and other magnetic or optical storage media.

19. Based on my knowledge, training, and experience, I know that computers and digital storage devices can store information for long periods of time.  Similarly, things that have been searched for and viewed via the Internet are typically stored for some period of time on a device.  This information can sometimes be recovered with forensic tools.

20. Based on my knowledge, training, and experience, examining data stored on computers and digital storage devices can uncover, among other things, evidence that reveals or suggests who possessed or used the computer or digital storage devices.

21. There is probable cause to believe that things that were once stored on the Device(s) may still be stored there, for at least the following reasons:

  a.  Based on my knowledge, training, and experience, I know that digital files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a digital storage device or computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

  b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a

computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

 c. Wholly apart from user-generated files, computer storage media including digital storage devices and computers' internal hard drives can contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

 d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  Forensic review may also disclose when and by whom the Internet was used to conduct searches, view material, and communicate with others via the Internet.

22. *Forensic evidence*.  As further described in Attachment B, this application seeks permission to locate not only electronically stored information on the Device(s) that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device(s) were used, the purpose of the use, who used the Device(s), and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device(s) because:

 a. Data on the storage medium can provide evidence of a file that was once on the storage media but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory

paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer or device was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created. This information can be recovered months or even years after they have been downloaded onto the storage medium, deleted, or viewed.

   b.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c.  A person with appropriate familiarity with how a digital storage device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   d.  The process of identifying the exact electronically stored information on storage media that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer or digital storage device and the application of knowledge about how a computer or digital storage device behaves. Therefore,

contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f. I know that when an individual uses an electronic device to aid in the commission of a crime, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: photos, text messages, and additional evidence related to drug distribution and violations of title 21 USC section 841 and 846.

g. I also know that those who engage in criminal activity will attempt to conceal evidence of the activity by hiding files, by renaming the format, (such as saving a .pdf image file as a .doc document file) or by giving them deceptive names such that it is necessary to view the contents of each file to determine what it contains.

h. A single compact disk can store dozens of images and hundreds of pages of text. The size of the electronic storage media (commonly referred to as a hard drive) used in home computers has grown tremendously within the last several years. Thumb drives with a capacity of 32 gigabytes are not uncommon. Flash cards with a capacity of 32 gigabytes are not uncommon. Hard drives with the capacity of 500 gigabytes up to 3

terabytes are not uncommon. These drives can store thousands of images and videos at very high resolution. Magnetic storage located in host computers adds another dimension to the equation. It is possible to use a video camera to capture an image, process that image in a computer with video capture capabilities, and save that image to storage in another country. Once this is done, there is no readily apparent evidence at the "scene of the crime." Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail.

23. *Need to review evidence over time and to maintain entirety of evidence.* I recognize the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches. I advise it would be impractical and infeasible for the Government to review the mirrored images of digital devices that are copied as a result of a search warrant issued pursuant to this Application during a single analysis. I have learned through practical experience that various pieces of evidence retrieved from digital devices in investigations of this sort often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops. In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole. Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum. Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its

full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original. In the past, I have reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations. I have learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in Attachment B. In order to obtain the full picture and meaning of the data from the information sought in Attachments A and B of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation. As such, I respectfully request the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time. As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

24. *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, copying and reviewing the contents of the Device(s) consistent with the warrant. The warrant I am applying for would authorize a later examination and perhaps repeated review of the Device(s) or information from a copy of the Device(s) consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might

expose many parts of the Device(s) to human inspection in order to determine whether it is evidence described by the warrant.

## BACKGROUND OF INVESTIGATION

25. On February 4, 2019, Colorado State Patrol Trooper Jeff Vrbas conducted a traffic stop of a vehicle operated by James WARE. Trooper Vrbas conducted the traffic stop of WARE for an unsafe lane change and speeding (82 in a 75 mile per hour zone). Based upon the information given by WARE, Trooper Vrbas developed reasonable suspicion that WARE was possibly driving a load of drugs. A short time later, a K-9 unit responded to the area and conducted a free air sniff of the vehicle. The K-9 gave a positive alert to the presence of illegal controlled substances. A search of the vehicle was conducted and Trooper Vrbas seized approximately 47.6 pounds of cocaine (Exhibit 1), 19 pounds of methamphetamine (Exhibit 2), and $1,600.00 in US currency (Exhibit N-1). In addition, CSP located one Apple I-phone within the vehicle as well as one Tom-Tom GPS unit within the vehicle. CSP contacted the DEA Grand Junction Resident Office (GJRO) who responded to the scene. WARE was transported to the Mesa County SO and interviewed by SA Jason Greenfield, SA Zachary Jones, and IA Amber Jones. SA Greenfield, as witnessed by SA Jones, read WARE his Miranda Warnings from a DEA form 13a. SA Greenfield asked WARE where he was from and WARE informed agents that he was from Chicago. The interview was recorded and is being maintained by Trooper Vrbas. In substance, WARE informed agents that he obtained the car in Oakland, CA, and was traveling to Chicago, IL. WARE asked what was found in the car and SA Greenfield informed WARE that agents were going to test it to determine what it was. SA Greenfield asked WARE what was going on. WARE informed agents that he rented the vehicle from the airport in Oakland, CA. WARE informed agents that the rental car agency offered an upgrade for him to the vehicle.

WARE informed agents that he rented the car on either Saturday or Sunday but was not sure and it would be on the rental agreement. WARE informed agents that he then got a room in Castro Valley about 20 minutes outside of Oakland. SA Jones asked what WARE was doing in Oakland and WARE informed agents that he was in Oakland to watch the super bowl with some friends but they did not show up. WARE informed agents that one of his friends rented the vehicle. SA Greenfield asked WARE what his friend's name was and WARE informed agents that it was on the rental agreement and that WARE only knew him as June Bug. WARE informed agents he only knew him for about a month to month and a half. WARE informed agents he was going to meet up with June Bug, John John, and Boogaloo to watch the game in Oakland but all the friends were from Oakland. WARE informed agents that he met them at one of the balloon events in Chicago. WARE informed agents that June Bug rented the car for him and that Budget offered him an upgrade. WARE informed agents that he was going to Chicago. SA Greenfield informed WARE that the car was due back in Oakland around the 15th. WARE informed agents that he was going to rent it for another week past that and then return the vehicle. WARE informed agents that he was going to drive back to Oakland in order to return the vehicle. SA Greenfield asked WARE how he would get back to Chicago after returning the vehicle to Oakland. WARE informed agents that he would probably fly back. SA Greenfield informed WARE that agents believed WARE'S story was a lie and that he knew the drugs were in the vehicle. WARE informed agents that he had no idea the drugs were in the vehicle. WARE believes that somebody from the rental agency placed the methamphetamine and cocaine inside the vehicle because they knew he was going that way. WARE informed agents that the rental car agency is where agents should be looking. A short time later, the interview was terminated.

26. SA Greenfield took custody of both the Apple I-Phone (Exhibit N-2) and the Tom-Tom GPS Unit (Exhibit N-3). SA Greenfield knows from experience and training in prior investigations that both phones and GPS unit contain information relevant to drug investigations to include but not limited to text message conversations, locations, prices, names and identifies of co-conspirators, pictures of drugs, and potential stash locations.

## RELEVANCE OF REQUESTED INFORMATION

27. Based upon the investigation of WARE to date, agents believe that the items seized during his arrest were used and would continue to be used for the purposes of transporting and delivering drugs to their intended recipients within Chicago.

28. Agents believe, based upon experience and knowledge of numerous drug investigations, that drug distributors use cellular phones to communicate with customers as well as each other. These communications are contained in text messages as well as in various communication apps such as WhatsApp or Facebook. In addition, the phones of drug traffickers often contain pictures of large amounts of cash, firearms, and drugs, which drug distributors may show to customers or post on social media.

29. Agents believe that executing a search warrant on the above listed items could lead to the seizure of additional large amounts of methamphetamine and additional evidence of trafficking of methamphetamine.

30. Agents believe that by searching the phones associated to WARE, agents may recover evidence of drug distribution and drug transportation.

31. Agents believe that searching the phones will lead to additional evidence of co-conspirators in the transportation, smuggling, and distribution of drugs.

32. Based on the foregoing, there is probable cause to believe that the execution of a search warrant on the listed items, further described in Attachments A, will lead to the location of drugs, additional methamphetamine, incriminating communications, phone numbers of co-conspirators, and will allow law enforcement personnel to gather additional evidence of violations of the Title 21, United State Code, Sections 841 and 846.

I, Jason Greenfield, a DEA Special Agent, being duly sworn according to law, hereby state that the facts stated in the foregoing affidavit are true and correct to the best of my knowledge, information and belief.

Respectfully submitted,

*s/ Jason R. Greenfield*
Jason R. Greenfield
Special Agent
Drug Enforcement Administration

Submitted, attested to, and acknowledged by reliable electronic means on March  4 , 2019.

_____
Gordon P. Gallagher
UNITED STATES MAGISTRATE JUDGE

Reviewed and submitted by Pete Hautzinger, Assistant United States Attorney.